S13Q0462. TAYLOR MORRISON SERVICES, INC.
v. HDI-GERLING AMERICA INSURANCE COMPANY.
(746 SE2d 587)

BLACKWELL, Justice.

Generally speaking, a standard commercial general liability (CGL) policy[1] insures against a liability to pay damages for " 'bodily injury' or 'property damage' [that] is caused by an 'occurrence,' " subject to certain limits and exclusions. In this coverage litigation, the United States Court of Appeals for the Eleventh Circuit has certified two questions to this Court, both of which concern the meaning of "occurrence," as that term is used in a standard CGL policy, and with respect to coverage for the potential liabilities of an insured for alleged "property damage" arising from faulty workmanship in residential construction. More specifically, the Eleventh Circuit has asked us to answer these questions:

1. Whether, for an "occurrence" to exist under a standard CGL policy, Georgia law requires there to be damage to "other property," that is, property other than the insured's completed work itself.
2. If the answer to Question One (1) is in the negative, whether, for an "occurrence" to exist under a standard CGL policy, Georgia law requires that the claims being defended not be for breach of contract, fraud, or breach of warranty from the failure to disclose material information.

[1] A "standard" CGL policy is one written on a standard policy form developed by the Insurance Services Office (ISO), an association of property and casualty insurers. See generally *Hartford Fire Ins. Co. v. California*, 509 U. S. 764, 772 (I) (A) (113 SCt 2891, 125 LE2d 612) (1993); *Sheehan Constr. Co. v. Continental Cas. Co.*, 935 NE2d 160, 162 (Ind. 2010). In this case, we are presented with a CGL policy written on standard ISO form CG 00 01 10 93, and as used in this opinion, "standard CGL policy" refers to a policy written on that form or another standard form that is identical in all material respects.

*HDI-Gerling America Ins. Co. v. Morrison Homes, Inc.*, 701 F3d 662, 669 (4) (11th Cir. 2012). For the reasons that follow, we answer the first question in the negative, and we answer the second question in the affirmative as to fraud and in the negative as to breach of warranty.[2]

We begin with a brief summary of the background of this litigation. The record shows that HDI-Gerling America Insurance Company issued a standard CGL policy to Morrison Homes, Inc., a predecessor of Taylor Morrison Services, Inc.[3] By the express terms of the policy, HDI-Gerling promised to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The policy clarifies that

> [t]his insurance applies to "bodily injury" and "property damage" only if:
>     (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and
>     (2) The "bodily injury" or "property damage" occurs during the policy period.

The policy expressly defines "property damage" as either "[p]hysical injury to tangible property" or "[l]oss of use of tangible property that is not physically injured." And it expressly defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The policy does not define "accident." The policy also contains a number of exclusions, including several known as the "business risk" — or in the construction context, the "builder's risk" — exclusions.[4]

Taylor Morrison is a homebuilder, and it was sued in California by sixteen homeowners, who sought to represent a class of more than 400 homeowners, all of whom owned homes built by Taylor Morrison in three California subdivisions. The homeowner-plaintiffs alleged that the concrete foundations of their homes were improperly con-

---

[2] In answering the second question, we do not consider breach of contract, except as a breach of a contractual warranty, for the reasons set forth in note 14, infra.

[3] In this opinion, we refer to Morrison Homes and Taylor Morrison Services, as the successor to Morrison Homes, collectively as "Taylor Morrison."

[4] The standard CGL policy includes five "business risk" exclusions: Exclusion j ("Damage to Property"); Exclusion k ("Damage to Your Product"); Exclusion l ("Damage to Your Work"); Exclusion m ("Damage to Impaired Property or Property Not Physically Injured"); and Exclusion n ("Recall of Products, Work or Impaired Property"). Evans & Berry, Ga. Gen. Liability Ins., § IV.J, p. 128 (2010).

structed, insofar as Taylor Morrison failed to lay four inches of gravel beneath the foundations, it failed to use adequate moisture barriers in the construction of the foundations, and it built the foundations with concrete having too high a water-to-cement ratio.[5] As a result, the homeowner-plaintiffs allege, the foundations are failing, and the defects in the foundations have caused "tangible physical damage" to the homes built atop the foundations, including "water intrusion, cracks in the floors and driveways, and warped and buckling flooring." Based on these allegations, as well as allegations that Taylor Morrison misrepresented or concealed material information about the construction of the foundations and homes, the homeowner-plaintiffs asserted seven legal claims against Taylor Morrison, seeking monetary damages, among other remedies. The California court certified a class of homeowners as to five of these claims, including claims for breach of express and implied warranties.

At first, HDI-Gerling undertook to defend Taylor Morrison against these claims, subject to a reservation of its rights. Then, in 2009, HDI-Gerling filed a lawsuit against Taylor Morrison in the United States District Court for the Northern District of Georgia, seeking a declaratory judgment that the claims for which a class was certified do not involve potential liabilities for which Taylor Morrison has coverage under its standard CGL policy. The district court awarded summary judgment to HDI-Gerling, finding no coverage for several reasons, including that the claims asserted against Taylor Morrison in California do not involve an "occurrence." In that respect, the district court reasoned that there is no "occurrence" when the only "property damage" alleged is damage to work of the insured, in this case, the homes that Taylor Morrison constructed. The district court applied Georgia law in its decision to award summary judgment to HDI-Gerling, a choice of law that no one appears to dispute.[6] Taylor Morrison appealed the award of summary judgment, and the Eleventh Circuit certified the questions to which we now turn.

1. About the first question, we addressed the meaning of "occurrence" — as used in a CGL policy, and in the context of a coverage dispute involving claims of faulty workmanship in residential construction — only two years ago, in *American Empire Surplus Lines Ins. Co. v. Hathaway Dev. Co.*, 288 Ga. 749 (707 SE2d 369) (2011), and

---

[5] Everyone seems to agree that the foundation work was done by subcontractors of Taylor Morrison, and indeed, Taylor Morrison has asserted cross-claims in the California class action against two subcontractors.

[6] It appears that the policy was delivered to Taylor Morrison in Georgia, and that circumstance is the basis for the application of Georgia law. See *Boardman Petroleum v. Federated Mut. Ins. Co.*, 135 F3d 750, 752 (II) (11th Cir. 1998).

our analysis begins with that recent decision. In *American Empire*, a general contractor sued its plumbing subcontractor for costs that the general contractor incurred as a result of the subcontractor's faulty workmanship, which apparently caused water and weather damage to "surrounding properties" that also were being developed by the general contractor. 288 Ga. at 750, 752. After the subcontractor defaulted, and a default judgment against it was entered, the general contractor sought satisfaction of the judgment from the subcontractor's CGL insurer. Id. at 750. The insurer defended on the ground, among others, that the faulty workmanship was no "occurrence," and the trial court awarded summary judgment to the insurer on that ground. The general contractor appealed, and the Court of Appeals reversed, holding that the faulty workmanship was accidental and, therefore, an "occurrence." *Hathaway Dev. Co. v. American Empire Surplus Lines Ins. Co.*, 301 Ga. App. 65, 69 (2) (686 SE2d 855) (2009). We granted a writ of certiorari to consider whether "the Court of Appeals err[ed] in its construction of the term 'occurrence.'" *American Empire*, 288 Ga. at 749-750.

Like the standard CGL policy in this case, the policy in *American Empire* defined an "occurrence" simply as "an accident, including continuous or repeated exposure to substantially the same, general harmful conditions," and it did not define "accident." 288 Ga. at 750. Accordingly, we "look[ed] to the commonly accepted meaning of the term," and we found that "accident" most commonly means "an unexpected happening without intention or design." Id. at 751 (citation and punctuation omitted). Upon this finding, we concluded that "an occurrence can arise where faulty workmanship causes unforeseen or unexpected damage to other property." Id. at 752. Our decision in *American Empire*, therefore, definitively establishes that faulty workmanship sometimes can amount to an "occurrence," at least when the property of someone other than the insured is damaged, a circumstance that was undisputed in *American Empire*. It does not answer the question, however, with which we are presented here, whether faulty workmanship also can amount to an "occurrence" when the only damage alleged is to work of the insured.

To answer that question, we begin as we began in *American Empire*, with the usual and common meaning of "accident." As we have explained before, "[a]n insurance policy is simply a contract, the provisions of which should be construed as any other type of contract," *Hunnicutt v. Southern Farm Bureau Life Ins. Co.*, 256 Ga. 611, 612 (4) (351 SE2d 638) (1987) (citation and punctuation omitted), and so, when the provisions of an insurance policy are clear and unambiguous, we attribute to those provisions their plain meaning. *Grain Dealers Mut. Ins. Co. v. Pat's Rentals, Inc.*, 269 Ga. 691, 693 (505 SE2d

729) (1998). An insurer is entitled, of course, to define terms used in its insurance policies as it sees fit, and it may choose to define a term in an unusual and uncommon way. But unless the policy itself indicates that a term is used in an unusual sense, we attribute to that term its usual and common meaning.[7] *American Empire*, 288 Ga. at 751. See also *Banks v. Brotherhood Mut. Ins. Co.*, 301 Ga. App. 101, 103 (1) (686 SE2d 872) (2009); *Empire Fire & Marine Ins. Co. v. Daniels*, 279 Ga. App. 602, 605 (1) (631 SE2d 799) (2006). As we noted in *American Empire*, in its usual and common usage, "accident" refers to "an unexpected happening without intention or design," Black's Law Dictionary at 15 (6th ed. 1990), an "event or change occurring without intent or volition through carelessness, unawareness, ignorance, or a combination of causes and producing an unfortunate result," Webster's Third New Intl. Dictionary at 11 (1969), or "[s]omething that occurs unexpectedly or unintentionally." The American Heritage Dictionary (Second College Ed.) at 71 (1991). It seems rather clear that, in its usual and common usage, "accident" conveys information about the extent to which a happening was intended or expected. Standing alone,[8] the word is not used usually and commonly to convey information about the nature or extent of injuries worked by such a happening, much less the identity of the person whose interests are injured.[9] We hold, therefore, that an "occurrence," as the term is used in a standard CGL policy, does not require damage to the property or work of someone other than the insured.

Nothing about our holding is inconsistent with the settled notion that CGL coverage generally is intended to insure against liabilities

---

[7] "Humpty Dumpty used a word to mean 'just what (he chose) it to mean — neither more nor less,' and [insurers], too, are free to be unorthodox," but when they seek to use a term in an unusual way, they need to clearly signify the unusual sense in which the word is used. Cf. *Lopez v. Gonzales*, 549 U. S. 47, 54-55 (II) (127 SCt 625, 166 LE2d 462) (2006) (citing L. Carroll, Alice in Wonderland and Through the Looking Glass at 198 (Messner 1982)). The insured, after all, is entitled to know what his insurance policy means, and ambiguities in a policy generally are construed against the insurer. See *State Farm Mut. Auto. Ins. Co. v. Staton*, 286 Ga. 23, 25 (685 SE2d 263) (2009) ("The policy should be read as a layman would read it[,] and not as it might be analyzed by an insurance expert or an attorney." (citation and punctuation omitted)).

[8] "Accident," of course, stands alone in the definition of "occurrence" that is found in the standard CGL policy.

[9] HDI-Gerling urges that an "accident" — and, therefore, an "occurrence" — necessarily must involve damage to the property or work of someone other than the insured, but no regular speaker of the English language would use "accident," without more, to convey information about the identity of the person whose interests are injured by the accidental happening. Imagine, for instance, that someone speaks of a person falling unexpectedly and unintentionally from a ladder. They likely would describe the fall as an "accident," regardless of whether it was the speaker himself who fell, or someone else. Just because the speaker referred to the fall as an "accident," no regular speaker of the English language would infer from that reference alone that it must have been someone other than the speaker who fell.

to third parties for injury to property or person, but not mere liabilities for the repair or correction of the faulty workmanship of the insured. See *Elrod's Custom Drapery Workshop v. Cincinnati Ins. Co.*, 187 Ga. App. 670 (371 SE2d 144) (1988). Remember that an "occurrence" alone is not enough to give rise to coverage under a standard CGL policy. The "occurrence" also must cause "bodily injury" or "property damage," and the insured must incur a liability to pay "damages because of [such] 'bodily injury' or 'property damage.' " Along with applicable exclusions, these other requirements of coverage are inherently better suited than the requirement of an "occurrence" to limit coverage in faulty workmanship cases to instances in which the faulty workmanship has damaged other, nondefective property or work. After all, "property damage," as that term is used in the standard CGL policy, necessarily must refer to property that is nondefective, and to damage beyond mere faulty workmanship,[10] and HDI-Gerling admits as much.[11] Moreover, as our Court of Appeals has held, certain "business risk" exclusions of a CGL policy also may

---

[10] Recall that the standard CGL policy defines "property damage" as "[p]hysical injury to tangible property" or "[l]oss of use of tangible property that is not physically injured." Property or work that is inherently defective because it was produced by faulty workmanship cannot be said to have been "physically injured" by the very faulty workmanship that brought it into being in the first place. Likewise, property or work that is inherently defective cannot be said to have sustained a "[l]oss of use" to the extent that it was unusable at its creation, inasmuch as a "[l]oss of use" necessarily requires that the property or work once have been capable of being put to use. A number of courts adopting, as we do, the usual and common understanding of "accident" have nonetheless concluded that a claim for the repair or replacement of faulty workmanship is not covered by a standard CGL policy – not because there was no "occurrence" – but most typically because such a claim is not a claim for "property damage." See, e.g., *Crossman Communities of N.C. v. Harleysville Mut. Ins. Co.*, 717 SE2d 589, 593 (III) (B) (S.C. 2011) (emphasizing "the difference between a claim for the costs of repairing or removing defective work, which is not a claim for 'property damage,' and a claim for the costs of repairing damage caused by the defective work, which is a claim for 'property damage' " (citation and punctuation omitted)); *Lyerla v. AMCO Ins. Co.*, 536 F3d 684, 691-692 (7th Cir. 2008) ("In the present case, the underlying complaint alleges that the work called for under the contract was performed improperly or incompletely; that is, it alleges faulty workmanship, not faulty workmanship that damaged property. The cost of repairing or replacing defective work is not 'property damage.' ") (applying Illinois law); *Auto-Owners Ins. Co. v. Pozzi Window Co.*, 984 S2d 1241, 1248 (Fla. 2008) ("[T]he mere inclusion of a defective component, such as a defective window or the defective installation of a window, does not constitute property damage unless that defective component results in physical injury to some other tangible property."); *U. S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 S2d 871, 889 (E) (Fla. 2007) (explaining that, "[i]f there is no damage beyond the faulty workmanship or defective work, then there may be no resulting 'property damage' "). By the way, we do not go further in this case and attempt to define the precise line of demarcation between defective and nondefective property or work when both are a part of the same project, insofar as the certified questions here are limited to the meaning of "occurrence," and do not go to the meaning of "property damage."

[11] In its brief to this Court, HDI-Gerling says that " 'property damage' contemplates property that previously was in an undamaged state (not property that is inherently damaged because of defective workmanship)."

serve to exclude liabilities for the repair or correction of defective work from the scope of coverage.[12] See, e.g., *SawHorse, Inc. v. Southern Guar. Ins. Co.*, 269 Ga. App. 493, 496-497 (1) (a) (604 SE2d 541) (2004). The limits of coverage do not all have to be found in the word "occurrence," inasmuch as the other words of the insuring agreement — as well as the policy exclusions — have their own roles to play in marking the limits of coverage. The sounder analytical approach is to avoid conflating the several requirements of the insuring agreement and the exclusions, and instead, to let each serve its proper purpose. See generally Evans & Berry, Ga. Gen. Liability Ins., at § IV.J, p. 129 (2010) (noting tendency of some courts to "not only strip [the various 'business risk'] exclusions of their individual identity, but also lump them with the 'occurrence' analysis"). See also *American Family Mut. Ins. Co. v. American Girl, Inc.*, 673 NW2d 65, 76 (III) (B) (ii) (Wis. 2004) ("We agree that CGL policies generally do not cover contract claims arising out of the insured's defective work or product, but this is by operation of the CGL's business risk exclusions, not because a loss actionable only in contract can never be the result of an 'occurrence' within the meaning of the CGL's initial grant of coverage. This distinction is sometimes overlooked, and has resulted in some regrettably overbroad generalizations about CGL policies in our case law.").

HDI-Gerling contends that our understanding of "occurrence" is inconsistent with three cases in which our Court of Appeals held, HDI-Gerling urges, that an "occurrence" requires damage to something other than the work of the insured. We disagree. In support of this contention, HDI-Gerling cites *SawHorse*, supra, *McDonald Constr. Co. v. Bituminous Cas. Corp.*, 279 Ga. App. 757 (632 SE2d 420) (2006), and *Custom Planning & Dev. v. American Nat. Fire Ins. Co.*, 270 Ga. App. 8 (606 SE2d 39) (2004). In *SawHorse*, the court concluded that the CGL policy at issue did not cover liability for damage to the completed work of the insured — a second story that the insured had erected atop a previously one-story house, a second story that was constructed defectively — because it was excluded by the "business risk" exclusions of the policy, not because the defective construction was no "occurrence." 269 Ga. App. at 496-497 (1) (a).

---

[12] As several courts have observed, these exclusions would be rendered largely superfluous by an overly narrow definition of "occurrence." See, e.g., *U. S. Fire Ins. Co.*, 979 S2d at 887 (D) ("[A] construction of the insuring agreement that precludes recovery for damage caused to the completed project by the subcontractor's defective work renders the 'products-completed operations hazard' exception to exclusion (j) (6) and the subcontractor exception to exclusion (l) meaningless."); *Lennar Corp. v. Great American Ins. Co.*, 200 SW3d 651, 673 (Tex. App. 2006) ("[F]inding no occurrence for defective construction resulting in damage to the insured's work would render the subcontractor exception superfluous and meaningless.").

*SawHorse*, therefore, does not concern at all whether an "occurrence" requires damage to something other than the work of the insured. Likewise, in *McDonald*, the court expressly "pretermitt[ed] whether the [faulty workmanship] constituted an 'occurrence' under the policy," 279 Ga. App. at 761 (1), assumed that the faulty workmanship was an accident, id. at 762 (1), and instead resolved the case based on the failure of the insured to show that its claim "arose from an obligation to pay damages for 'bodily injury' or 'property damage' resulting from such an 'accident.' " Id. *McDonald* too has nothing to say about whether an "occurrence" requires damage to something other than the work of the insured.

*Custom Planning* also is consistent with our understanding of the insuring agreement of the standard CGL policy. In *Custom Planning*, the insured-developer purchased a lot and built a house and pool upon it. The insured also hired a subcontractor to build a retaining wall upon the lot. The insured later sold the lot — with the house, pool, and retaining wall — and a few years later, the home-owners took the insured to arbitration, and the court held that the defective construction of the retaining wall gave rise to no coverage, in part because the arbitrator had found that "no other [nondefective] property, *i.e., the swimming pool*, was damaged as a consequence of the faulty workmanship." 270 Ga. App. at 10 (1) (emphasis supplied). But the pool — like the retaining wall — was a work of the insured. If the insuring agreement required damage to something other than the work of the insured, the *Custom Planning* court most certainly would not have identified the pool built by the insured as "other property" that might give rise to coverage. Although *Custom Planning* did treat the "other [nondefective] property" requirement as a component of the "occurrence" requirement, a treatment that we disapprove — it is more properly considered as a component of the "property damage" requirement, as we have explained — the result in *Custom Planning* is perfectly consistent with our decision today, and we need not overrule *Custom Planning* outright. HDI-Gerling points to no Georgia precedent that would have a different outcome under our approach, and we have found none.

Our understanding of the insuring agreement also is consistent with the "strong recent trend in the case law [that] interprets the term 'occurrence' to encompass unanticipated damage to nondefective property resulting from poor workmanship." *Greystone Constr., Inc. v. Nat. Fire & Marine Ins. Co.*, 661 F3d 1272, 1282 (10th Cir. 2011).

> [M]ost federal circuit and state supreme court cases [now] line up in favor of finding an occurrence in [the context of a

claim by homeowners against an insured-homebuilder for damage to nondefective portions of a home resulting from the defective construction of another portion of the home].

Id. Indeed, we find a number of recent decisions in our sister states that construe "occurrence" without reference to the identity of the person whose property or work is damaged thereby. See, e.g., *Capstone Bldg. Corp. v. American Motorists Ins. Co.*, 308 Conn. 760, 776 (II) (A) ("[B]ecause negligent work is unintentional from the point of view of the insured, we find that it may constitute the basis for an 'accident' or 'occurrence' under the plain terms of the [CGL] policy."); *Crossman Communities of N.C. v. Harleysville Mut. Ins. Co.*, 717 SE2d 589, 592-593 (III) (B) (S.C. 2011) (holding that faulty workmanship on exteriors of condominium projects that resulted in water damage to nondefective interiors was an "occurrence," notwithstanding that insureds were the developers of the projects); *Stanley Martin Cos. v. Ohio Cas. Group*, 313 Fed. Appx. 609, 614 (III) (4th Cir. 2009) (under Virginia law, "obligation to repair or replace . . . defective trusses" involved no "occurrence," but "any mold damage that spread beyond the defective trusses and the gypsum fire walls to nondefective components of the townhouses [that the insured built]" was an "occurrence"); *U. S. Fire Ins. Co.*, 979 S2d at 885 (D) ("[W]e reject a definition of 'occurrence' that renders damage to the insured's own work as a result of a subcontractor's faulty workmanship expected, but renders damage to property of a third party caused by the same faulty workmanship unexpected."); *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 SW3d 1, 16 (Tex. 2007) ("[C]laims for damage caused by an insured's defective performance or faulty workmanship may constitute an 'occurrence' when 'property damage' results from the unexpected, unforeseen[,] or undesigned happening or consequence of the insured's negligent behavior." (citation and punctuation omitted)); *French v. Assurance Co. of America*, 448 F3d 693, 706 (II) (A) (4th Cir. 2006) (under Maryland law, standard CGL policy "does not provide liability coverage to a general contractor to correct defective workmanship performed by a subcontractor," but it does "provide[ ] liability coverage for the cost to remedy unexpected and unintended property damage to the contractor's otherwise nondefective work-product caused by the subcontractor's defective workmanship"); *American Girl*, 673 NW2d at 78 (III) (B) (ii) (finding an "occurrence" where a faulty foundation led to damage to "the rest of the structure," both of which had been built by the insured-general

contractor or its subcontractors).[13]

With this understanding of the insuring agreement — the usual and common meaning of "accident," the definition of "occurrence" that flows therefrom, and the additional limitations imposed by the requirement of "property damage" — we answer the first certified question in the negative.

2. We next consider whether an "occurrence" requires that the liabilities for which coverage is claimed must be based on some legal theory other than fraud or breach of warranty.[14] As we noted earlier, the standard CGL policy defines "occurrence" only as an "accident," it does not expressly define "accident," and we look, therefore, to the usual and common meaning of "accident." *American Empire*, 288 Ga. at 751. Just as "accident" — in its usual and common usage, and without more — conveys nothing about the nature or extent of the injuries worked by the unexpected happening, the word also conveys no information about the nature of the legal theory through which liability might arise from the happening, except in one important respect. To the extent that a theory of liability is absolutely and necessarily inconsistent with the notion of an "accident" — that is, when the theory of liability and the idea of an "accident" are mutually exclusive — a claim premised upon such a theory of liability could not possibly involve an "occurrence."

---

[13] Only two years ago, this Court cited three of these decisions approvingly and in connection with the meaning of "occurrence," see *American Empire*, 288 Ga. at 751-752 (citing *U.S. Fire Ins. Co.*, *American Girl*, and *Lamar Homes*).

[14] As framed by the Eleventh Circuit, the second certified question inquires whether the liabilities must be based on some theory other than "breach of contract, fraud, or breach of warranty from the failure to disclose material information." In its certification order, however, the Eleventh Circuit added that

> [t]he particular phrasing used in the certified question is not to restrict the Supreme Court's consideration of the problems involved and the issues as the Supreme Court perceives them to be in its analysis of the record certified in this case. This latitude extends to the Supreme Court's restatement of the issue or issues and the manner in which the answers are given, whether as a comprehensive whole or in subordinate or even contingent parts.

*HDI-Gerling*, 701 F3d at 669 (IV) (citation omitted). We find it appropriate to limit our consideration of the second question to claims of fraud and breach of warranty. From our review of the record, the California litigation appears to involve no claim for breach of contract, other than for breach of a contractual warranty. Accordingly, we will not address breach of contract, other than as a breach of warranty. In addition, we consider breach of warranty generally, as opposed to breach of warranty premised specifically upon a "failure to disclose material information." In the California litigation, the homeowner-plaintiffs did not rely on any warranty of disclosure, but instead upon alleged warranties that the homes were suited and safe for their intended use and purpose and were of merchantable quality. The failure of the homes to have the warranted quality and characteristics is the alleged breach, not a failure to disclose.

Fraud claims generally are such claims. Under Georgia law, the tort of fraud has five elements, including scienter and intention to induce the plaintiff to act or refrain from acting. *Stiefel v. Schick*, 260 Ga. 638, 639 (1) (398 SE2d 194) (1990). Likewise, under California law, the tort of fraud necessarily involves almost identical elements. See *Lazar v. Superior Court*, 909 P2d 981, 984 (II) (A) (Cal. 1996) ("[t]he elements of fraud . . . are (a) misrepresentation . . . (b) knowledge of falsity (or 'scienter'); (c) intent to defraud . . . ; (d) justifiable reliance; and (e) resulting damage") (citation omitted). It is difficult for us to conceive of a circumstance in which a claim of fraud might properly be premised upon "bodily injury" or "property damage" that was caused by an "accident." We do not absolutely foreclose the possibility that the law of some jurisdiction might allow a theory of liability denominated as "fraud" that is not necessarily inconsistent in some exceptional circumstance with the notion of an "accident," but it is substance, not a label, that matters. In most circumstances, a claim for fraud — at least as we know "fraud" in the law of Georgia — will prove incompatible with the notion of "accident" and will not, therefore, involve an "occurrence." See *Ga. Farm Bureau Mut. Ins. Co. v. Hall County*, 262 Ga. App. 810, 813 (1) (586 SE2d 715) (2003) (where complaint alleged fraud, "the only reasonable inference to be drawn from the alleged facts is that [insured's] failure to inform . . . was not an 'accident' "). Consequently, in most cases, for an "occurrence" to exist, the claims must be for something other than fraud, and we answer the second question in the affirmative with respect to fraud.

Breach of warranty, however, is a different story. Although the making of an express warranty — or the entry of a transaction from which an implied warranty arises by operation of law — undoubtedly is an intentional act, the breach of a warranty may not be. It is true enough that the breach of a warranty *could be* intentional. But warranty law, generally speaking, imposes strict liability; regardless of intent or culpability, if a product or other work is of a quality that is materially less than that which was warranted, the warranty is breached. See Charles R. Adams III, *Georgia Law of Torts* § 25.5 (2012-2013 ed.); see also William L. Prosser, *Handbook of the Law of Torts* 636 (4th ed. 1971). In many cases, faulty workmanship may cause a product or other work to amount to a breach of a warranty for the product or work. And we already have held that faulty workmanship can constitute an "occurrence." See *American Empire*, 288 Ga. at 752. So, in many cases, an "occurrence" might be found in the context

of a claim for breach of warranty.[15]

That said, even a breach of warranty that involves an "occurrence" will not necessarily — or even usually — give rise to coverage under a standard CGL policy. Remember that the standard CGL policy only insures against a liability to pay "damages because of 'bodily injury' or 'property damage,'" and as we said in Division 1, when faulty workmanship in residential construction is the "occurrence," "property damage" may be found only when the faulty workmanship causes physical injury to, or the loss of use of, nondefective property or work. As such, it generally will only be a breach of a warranty of nondefective property from which coverage might arise, as liability for a breach of the warranty of the defective property would not involve "damages *because of*" "property damage" to the nondefective property. In addition, certain exclusions may apply to limit coverage in breach of warranty cases. Nevertheless, as in Division 1, we conclude that permitting each requirement of the insuring agreement and exclusion to serve its own purpose is a sounder analytical approach than any endeavor to make "occurrence" bear the entire burden for defining the limits of coverage. As such, for an "occurrence" to exist for purposes of a standard CGL policy, it is not always necessary that the claim be for something other than breach of warranty, and as to breach of warranty, we answer the second question in the negative.

*Certified questions answered. Hunstein, C. J., Thompson, P. J., Benham, Hines, Melton, JJ., and Judge Ellen McElyea concur. Nahmias, J., not participating.*

---

[15] In *Custom Planning*, 270 Ga. App. at 10 (1), the Court of Appeals said that "[o]ccurrence does not mean a breach of contract, fraud, or breach of warranty from the failure to disclose material information." As we explain in note 14, supra, this case is not one in which the breach of warranty claims are premised squarely on a failure to disclose. Moreover, the above-quoted statement in *Custom Planning* appears to have been dicta, inasmuch as the court went on to otherwise consider whether the case involved an "accident," and it does not seem to have based its judgment on the mere fact that the insured was only found liable for breach of contract and warranty. Third, the quoted statement literally is true; "occurrence" does not "mean" a breach of warranty even if some breaches of warranty might involve an "accident" and, therefore, an "occurrence." That said, to the extent that *Custom Planning* dicta suggests that a breach of warranty claim *never* can involve an "occurrence," it is disapproved, though, as we said earlier, *Custom Planning* would turn out as it did under our analysis. We do overrule, however, *Forster v. State Farm Fire & Cas. Co.*, 307 Ga. App. 89 (704 SE2d 204) (2010), which relied on the dicta in *Custom Planning* to affirm the grant of summary judgment to an insurer with regard to any construction defects constituting a breach of warranty, without any further consideration of whether an "occurrence" was involved.

DECIDED JULY 12, 2013.

*Kilpatrick, Townsend & Stockton, Julie A. Lierly, Caroline W. Spangenberg, Ellen P. McCarley*, for appellant.

*Freeman, Mathis & Gary, Michael P. Bruyere, Fields, Howell, Athans & McLaughlin, Ann T. Kirk*, for appellee.

*King & Spalding, Zachary D. Tripp, Martin M. McNerney, Taylor T. Lankford, Anthony P. Tatum, McMickle, Kurey & Branch, Kevin P. Branch, Dana M. Mango, Ryan M. Suerth, Weissman, Nowack, Curry & Wilco, Linda B. Foster, McKenna, Long & Aldridge, John S. Berry, Wiley Rein, Laura Foggan, Matthew W. Beato*, amici curiae.