**FOURTH DIVISION**
**ELLINGTON, P. J.,**
**DILLARD and MCFADDEN, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**August 31, 2016**

# In the Court of Appeals of Georgia

A16A0705.  COLUMBIA  CASUALTY  COMPANY  v.  JE-027 PLANTATION PIPE LINE COMPANY.

ELLINGTON, Presiding Judge.

Plantation Pipe Line Company filed this action in the Superior Court of Fulton County against five of its excess liability insurers, including Columbia Casualty Company, seeking relief including a declaratory judgment as to each insurer's respective share of Plantation's losses arising from a pipeline leak. See *Plantation Pipe Line Co. v. Stonewall Ins. Co.*, 335 Ga. App. 302 (780 SE2d 501) (2015), cert. denied April 26, 2016 (appeal by Plantation from order granting summary judgment in favor of another of Plantation's excess liability insurers, Stonewall Insurance Company). Plantation and Columbia filed cross-motions for summary judgment. The trial court granted Plantation's motion and denied Columbia's cross-motion.

Columbia appeals both rulings, contending that the trial court erred in allocating all of Plantation's losses to the policies that were in place at the time of the fuel leak, rather than allocating Plantation's losses pro rata among the multiple, successive policies that were issued to Plantation over the thirty-year period during which the environmental contamination continued to accrue. When Plantation's losses are properly allocated, Columbia contends, the losses attributable to the policy period of the Columbia policy as a matter of law did not reach the attachment point of the policy, which is a prerequisite to coverage under the policy. For the reasons explained below, we affirm.

The record shows the following relevant undisputed facts.[1] On April 2, 1976, Plantation employees discovered that turbine fuel had leaked from an underground Plantation pipeline located in Cabarrus County, North Carolina. *Plantation Pipe Line Co. v. Stonewall Ins. Co.*, 335 Ga. App. at 303. Within 24 hours, Plantation repaired the pipeline and cleaned up the leak. Id. Without resorting to insurance, it compensated the only affected landowner $50. Id. More than thirty years later, on April 3, 2007, one of Plantation's workers found contaminated soil during

---

[1] Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law [.]" OCGA § 9–11–56(c).

> Summary judgments enjoy no presumption of correctness on appeal, and an appellate court must satisfy itself de novo that the requirements of OCGA § 9–11–56(c) have been met. In our de novo review of the grant [or denial] of a motion for summary judgment, we must view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmovant.

(Citations and punctuation omitted.) *Cowart v. Widener*, 287 Ga. 622, 624 (1) (a) (697 SE2d 779) (2010).

> When, as in this case, the parties file cross-motions for summary judgment, "each party must show that there is no genuine issue of material fact regarding the resolution of the essential points of inquiry and that each, respectively, is entitled to summary judgment; either party, to prevail by summary judgment, must bear its burden of proof.

(Citation and punctuation omitted.) *Plantation Pipe Line Co. v. Stonewall Ins. Co.*, 335 Ga. App. at 302.

maintenance of Plantation's pipeline, and the contamination was traced to the 1976 leak.

Plantation filed this action in 2012, seeking recovery for amounts it has spent to settle third party claims, amounts it has expended for remediation, and projected costs to complete remediation. A Plantation executive estimates that Plantation's costs through 2030 will total between $5.6 million and $8.6 million.

The record shows that, at the time the initial fuel leak occurred in Cabarrus County in April 1976, Plantation had $1,000,000 in primary coverage under a comprehensive general liability ("CGL") policy issued by American Reinsurance Company (subject to a self-insured retention of $100,000), and had excess coverage, including $1 million under an umbrella policy issued by Lexington Insurance Company. *Plantation Pipe Line Co. v. Stonewall Ins. Co.*, 335 Ga. App. at 302. In late 1975, Columbia issued an "Excess Third Party Liability Policy" to Plantation for the period of January 24, 1976 through November 30, 1976. Unless otherwise provided,

4

the Columbia excess policy incorporated the terms of the Lexington umbrella policy.[2]

In the Insuring Agreements in the Lexington umbrella policy, Lexington agreed

> [t]o pay on behalf of [Plantation] the ultimate net loss in excess of the underlying insurance[ (the self-insured retention and the primary CGL policy issued by American)], which [Plantation] shall become legally obligated to pay as damages by reason of the liability imposed upon [Plantation] by law . . . because of . . . [p]roperty [d]amage . . . caused by or arising out of an occurrence.

In the Insuring Agreements in the Columbia excess policy, Columbia agreed

to indemnify Plantation for loss in excess of the limits of liability of the Lexington

---

[2] The Columbia policy provides:
> The provisions of the immediate underlying policy are incorporated as a part of this policy except for any obligation to investigate and defend and pay for costs and expenses incident to the same, the amount of the limits of liability, any "other insurance" provision and any other provisions therein which are inconsistent with the provisions of this policy.

The Columbia policy defines the "Immediate Underlying Policy" as "the policy of the underlying insurance which provides the layer of coverage, whether primary or excess, immediately preceding the layer of coverage provided by this policy." It is undisputed that the Lexington policy alone met this definition.

5

policy, which was the "underlying insurance."[3] The Insuring Agreements in the Columbia policy further provide as follows:

> This policy applies to injury or destruction taking place during this policy period, provided that when the immediate underlying policy insures occurrences taking place during its policy period, instead of injury or destruction taking place during its policy period, then this policy likewise applies to occurrences taking place during this policy period[,] and "occurrences" is substituted for "injury or destruction" in Part III of this policy [regarding reduction of the aggregate].

Because the Lexington policy "insures occurrences taking place during its policy period," therefore, the Columbia policy "likewise applies to occurrences taking place during [the] policy period[.]" The Lexington policy, and therefore the Columbia policy, covers "[p]roperty [d]amage . . . caused by or arising out of an occurrence." As the definitions for "property damage" and "occurrence" set forth in the Lexington policy are specifically incorporated in the Columbia policy,

> [w]ith respect to . . . [p]roperty [d]amage[,] the term "[o]ccurrence" means an event, including continuous or repeated exposure to conditions, which result in . . . [p]roperty [d]amage neither expected nor

---

[3] The Columbia policy defines the "Underlying Insurance" as "the insurance policies listed in item 3 in the declarations[.]" The Lexington policy was listed in item 3.

intended from the standpoint of the insured. All such exposure to substantially the same general conditions shall be deemed one occurrence.

The declarations page shows that the Columbia policy of excess umbrella liability was in the amount of "$500,000 CSL [Combined Single Limit] per occurrence/aggregate being 8% [sic[4]] of $4,000,000 CSL per occurrence/aggregate excess of $1,000,000 CSL per occurrence/ aggregate." It is undisputed that the attachment point of the Columbia excess policy was $2 million.[5]

1. Columbia contends that it is entitled to judgment as a matter of law that the policy it issued to Plantation is not triggered by the claims at issue in this case.

Columbia points to evidence that the environmental contamination caused by the occurrence at issue, the April 1976 fuel leak, continued to unfold (and even to this day continues to unfold), as the quantity of pollutant that Plantation failed to clean up in 1976 migrated downward through the soil, reached flowing groundwater and

---

[4] It is undisputed that $500,000 represents 12.5 percent, not 8 percent, of $4,000,000, the total in excess coverage provided by Columbia and four other carriers.

[5] See J. Stephen Berry et al., Ga. Property & Liability Insurance Law, § 8:2 (updated August 2015) (explaining that excess liability policies are typically triggered only by the exhaustion of all underlying limits and, therefore, liability of an excess insurer generally will "attach" only when any underlying policies are exhausted).

7

formed a plume in the water table, where it contaminated clean water that made contact with the contaminated water, and that such contamination of previously clean water will continue to occur until the remediation process is complete. Columbia argues that this is typical of environmental contamination cases because environmental contamination by its nature occurs over time, gradually or progressively causing personal injury or property damage, which may be unknown to the injured parties for years.

Columbia points to evidence that from 1976 through 2005 several different insurers issued liability policies to Plantation. Over time, the overall coverage profile varied, as the limits of the different policies, the scheme of the different layers of coverage (self-insured retention, primary coverage, umbrella coverage, excess coverage, etc.), and areas of overlapping coverage all varied from year to year. Columbia argues that it is typical of environmental contamination cases that, because of the progressive nature of environmental contamination, the resulting personal injury or property damage overlaps multiple successive insurance policy periods of the insured's liability coverage. And Columbia contends that in this case multiple successive insurance policies were potentially triggered during later policy periods by the unfolding environmental damage that originated with the 1976 pipeline leak

8

and that Plantation's losses from remediation costs[6] and third-party claims should be allocated among those policies by the Court.

Columbia argues that the legal issue of the appropriate method of allocation is one of first impression in Georgia. Columbia contends that

> the legal issue this Court must resolve is the appropriate trigger theory to apply to a claim involving progressive, latent "property damage" that took place over a three decade long period so that it can determine which policies are applicable to the damages at issue, as well as the extent of coverage owed, and the sequence in which the policies should apply.

---

[6] Columbia does not dispute that the cost to Plantation to perform remediation of the contamination is "property damage" under the policy, that is, money that Plantation is legally obligated to pay as damages by reason of liability imposed by law because of property damage caused by or arising out of the 1976 pipeline leak. See Rebecca M. Bratspies, "Splitting the Baby: Apportioning Environmental Liability Among Triggered Insurance Policies," 1999 BYU L. Rev. 1215, 1223-1224 (I) (A) (1) (1999) ("[C]ourts have typically found contamination of the environment to fall within the ambit of [CGL policies'] property damage clause. Similarly, most courts conclude that any monies a [potentially responsible party] pays to comply with government orders under [the federal Comprehensive Environmental Responsibility, Compensation and Liability Act] constitute property damages covered under CGL policies. This holds true even when the government orders cleanup of the [potentially responsible party's] own property.") (footnotes omitted).

Columbia urges the Court to adopt the so-called "continuous trigger theory."[7]

_____

[7] According to one commentator, strategies for apportioning liability among multiple insurance policies for losses from environmental contamination can all be divided into two theoretical frameworks: horizontal allocation or vertical allocation. See Rebecca M. Bratspies, "Splitting the Baby: Apportioning Environmental Liability Among Triggered Insurance Policies," 1999 BYU L. Rev. at 1231 (I) (B). In horizontal allocation, including "continuous trigger" allocation, liability is assigned along a horizontal time axis to all policy periods on the risk over the time period of continuing environmental contamination; in vertical allocation, liability is assigned along a vertical coverage axis to all insurers within a selected policy period, which is not necessarily the policy period in which an event like a fuel spill occurred. Id. at 1231, 1233-1234, 1241, 1246-1247. See e.g. *Towns v. Northern Security Ins. Co.*, 964 A2d 1150, 1163-1165 (III) (Paras. 25-31) (Vt. 2008) (The trial court properly applied a continuous-trigger test to determine whether an injury-producing occurrence gave rise to coverage under a policy in a case involving long term environmental damage that occurred continuously from the date of exposure or initial injury through successive policy periods even though the damage was not manifested until after the policy had expired.).

> With a continuous trigger, a long-tail injury is deemed to have "occurred" at each and every point of time at which there was contributing contamination. Essentially, the courts create a rebuttable presumption that one injury or occurrence happened every year from the date the gradual injury began to the date of the claim. As a result, every insurance policy in effect during the course of the environmental injury is potentially liable on the claim. A continuous trigger has the effect of maximizing coverage because property damage that is continuous throughout successive policy periods will implicate all policies in effect during those periods.

(Footnotes omitted.) Rebecca M. Bratspies, "Splitting the Baby: Apportioning Environmental Liability Among Triggered Insurance Policies," 1999 BYU L. Rev. at 1230-1231 (I) (B). We note that the Court of Appeals for the Eleventh Circuit certified to the Supreme Court of Georgia a question regarding the trigger of coverage in cases involving pollution. *Boardman Petroleum v. Federated Mut. Ins. Co.*, 269 Ga. 326 (498 SE2d 492) (1998). The Supreme Court decided the case on other

Columbia argues that Plantation's total financial loss from the latent, continuous, and progressive property damage that took place over three decades should be allocated pro rata among each successive policy period from 1976 to 2007, when the contamination was discovered and became "manifest." When this is done, Columbia argues, the amount of loss properly allocated to the policy period of the policy it issued to Plantation is far less than the $2 million attachment point for the excess coverage it provides.[8] As a result, Columbia contends, its policy is not triggered as

grounds, leaving the trigger-of-coverage question unresolved.

[8] Specifically, Columbia avers that successive policies were issued to Plantation "from January 1, 1976 through April 30, 2005, a period of twenty-nine (29) years" and argues that "[t]o reasonably allocate the amount of property damage attributable to these successive policies this Court should employ a pro rata time on the risk formula; i.e., divide $8.6 million . . . cost to remediate the site by the twenty-nine (29) years of successive policy periods. This formula results in property damage of $296,551.72 being allocated to each successive policy, starting with Columbia's policy period – clearly, a loss that will not trigger this excess Policy." As evidence that there are 29 years of successive policy periods among which the loss can be that allocated, Columbia points to the affidavit of a long time employee of Risk International Services, Inc. ("RIS"), a company that was hired to reconstruct Plantation's insurance coverage for the period 1950 to 2005 and to a chart prepared by RIS showing the insurers and layers of coverage for each year. See *Plantation Pipe Line Co. v. Stonewall Ins. Co.*, 335 Ga. App. at 304.

Although it is not determinative of our decision for the reasons explained below, we note that Columbia contends that it is not required to introduce the other allegedly triggered policies to prevail on its "continuous trigger" argument. Even if we were to hold that it is appropriate to employ any of the various strategies to allocate a loss among triggered policies, as Columbia asks us to do, however, the

a matter of law under the continuous trigger theory. Moreover, Columbia argues, the result would be the same if the Court were to adopt in the alternative the so-called "injury in fact" trigger theory.

Even if this Court were inclined to adopt the continuous trigger theory,[9] application of this theory is premised on the assumption that the Columbia policy contains language that limits coverage to property damage that takes place during the

specific provisions of the various policies would be relevant. For example, by its terms, any policy containing an absolute pollution exclusion would not be triggered by the sort of environmental contamination injury at issue here. See Rebecca M. Bratspies, "Splitting the Baby: Apportioning Environmental Liability Among Triggered Insurance Policies," 1999 BYU L. Rev. at 1225-1226 (I) (A) (1), 1259, 1262 (IV) (B) (In 1986, standard CGL policies began including an absolute pollution exclusion, with the result that after that point an insured who could not or did not purchase pollution coverage in addition to its CGL policy would be considered uninsured or self-insured for such claims.). Columbia's allocation of Plantation's projected loss of up to $8.6 million across 29 years of successive policies unaccountably assumes that none of the other policies contained an absolute pollution exclusion.

[9] See Rebecca M. Bratspies, "Splitting the Baby: Apportioning Environmental Liability Among Triggered Insurance Policies," 1999 BYU L. Rev. at 1238-1239 (II) (A) (3) (According to this commentator, one weakness of horizontal allocation strategies, like the continuous trigger theory, is that they implicitly read a pro rata allocation clause into the CGL policies, contrary to the general rule that pro rata clauses, which serve to limit an insurer's indemnity obligation to a insured, are typically considered exclusionary provisions and, as such, should not be imputed into an insurance contract.).

12

policy period. But, unlike more contemporary standard CGL policies,[10] the Columbia policy and the provisions of the Lexington policy that it expressly incorporates do *not* provide that the policy applies only to property damage that occurs during the policy period. As quoted extensively above, the insuring agreement in the Columbia policy provides that the policy applies to injury taking place during the policy period *unless*, instead of insuring *injury* taking place during the policy period, the Lexington policy insures *occurrences* taking place during the policy period, which it does. In this case, then, the Columbia policy expressly "applies to occurrences taking place during [the] policy period." Columbia could have drafted the substitution clause to provide that, if the underlying policy insures occurrences taking place during the policy period, then the Columbia policy applies to occurrences taking place during the policy period

---

[10] In a recent Supreme Court of Georgia decision, the Court noted that, in a standard CGL policy, the insurer now expressly

> promise[s] to pay those sums that the insured becomes legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies. The [standard] policy clarifies that *this insurance applies to* bodily injury and *property damage only if*: (1) [t]he bodily injury or property damage is caused by an occurrence that takes place in the coverage territory; and (2) [t]he bodily injury or *property damage occurs during the policy period*.

(Citations and punctuation omitted; emphasis supplied.) *Taylor Morrison Svcs., Inc. v. HDI-Gerling Am. Ins. Co.*, 293 Ga. 456, 457 (746 SE2d 587) (2013).

*to the extent of injury taking place during the policy period.*[11] It did not do so. Therefore, contrary to Columbia's assertion, this case does not present us with the issue of how to allocate this type of loss among multiple, successive policies that each cover property damage that occurs during the policy's policy period. Instead, we are presented with a policy that by its plain terms covers property damage caused by an occurrence, provided the occurrence takes place during the policy period and provided the insured's loss exceeds the attachment point of the policy. And it is undisputed that an occurrence took place during Columbia's policy period (the fuel leak in April 1976), that property damage occurred as a result of the occurrence, and that Plantation's losses have exceeded the $2 million attachment point of the policy's

---

[11] See Rebecca M. Bratspies, "Splitting the Baby: Apportioning Environmental Liability Among Triggered Insurance Policies," 1999 BYU L. Rev. at 1222 (I) (A) (Between 1966 and 1986, most CGL policies defined occurrence as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured.") (punctuation and footnote omitted).

excess coverage. Columbia's argument that its policy was not triggered fails.[12] The trial court did not err in denying Columbia's motion for summary judgment.

2. Columbia contends that the trial court erred in granting Plantation's motion for summary judgment. Specifically, Columbia argues that "when the continuous trigger and/or injury-in-fact theories of allocation are applied to this case" its policy is not triggered as a matter of law. As explained in Division 1, supra, this argument, fails because the Columbia policy does not contain language that limits coverage to property damage that takes place during the policy period, which underpins

---

[12] See *Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.*, 926 FSupp. 1566, 1577-1578 (2) (S.D. Ga. 1995) (Where a CGL policy defined an occurrence as continuous or repeated exposure to a condition that results in property damage which occurs during the policy period and that is not expected nor intended from the standpoint of the insured, there was an occurrence at the moment gasoline was released into the ground from an underground storage tank. Because the policy did not expressly provide that it applied only where an occurrence was discovered during the policy period, the insurer could not disclaim coverage on the basis that the occurrence was not manifest during the policy period.), reversed on other grounds, 150 F3d 1327 (11th Cir. 1998); *S. Carolina Ins. Co. v. Coody*, 813 FSupp. 1570, 1575-1577 (1) (a) (M.D. Ga. 1993) (Where a CGL policy defined an occurrence as an accident, including continuous or repeated exposure to substantially the same general harmful conditions, where the policy unambiguously provided that there was coverage only if an injury occurred within the policy period, and where improper releases of toxic industrial waste into the soil occurred after the policy period went into effect, which were discovered before the policy period ended, an occurrence took place that triggered coverage, under any trigger-of-coverage rule – the exposure, manifestation, double trigger, continuous trigger, or actual injury rule.).

Columbia's allocation argument. In a related vein, Columbia argues that Plantation failed to identify any evidence that more than $2 million worth of property damage occurred during the coverage period for the Columbia policy, again restating its argument that its policy was not triggered. This argument likewise fails for the reasons already explained above.

In addition, Columbia contends that Plantation's reliance on the so-called "known loss" doctrine[13] is misplaced because the doctrine is not the law of Georgia

---

[13] As one court has explained the known loss doctrine:

> If the insured knows or has reason to know, when it purchases a CGL policy, that there is a substantial probability that it will suffer or has already suffered a loss, the risk ceases to be contingent and becomes a probable or known loss. Where the insured has evidence of a probable loss when it purchases a CGL policy, the loss is uninsurable under that policy (unless the parties otherwise contract) because the risk of liability is no longer unknown.

(Citations and punctuation omitted.) *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 NE2d 1204, 1210 (Ill. 1992). See *S. Carolina Ins. Co. v. Coody*, 813 FSupp. at 1577-1578 (1) (b) (Where environmental damage was discovered during an official investigation the year before the insured obtained coverage for its property, coverage was not triggered under any of the five approaches used for determining whether an occurrence took place during the policy period because, under every approach, an insured is not entitled to coverage under a policy obtained after the insured is aware of an occurrence prior to the policy period.); see also J. Stephen Berry et al., Ga. Property & Liability Insurance Law, § 3:14 (updated August 2015) (explaining that "Georgia courts have neither adopted nor rejected the 'known loss' doctrine" and noting that many modern policies incorporate the doctrine through specific policy language) (footnote omitted).

and because the doctrine is inapplicable, given the fact that "Plantation judicially admitted it did not know petroleum product and contaminants remained subsurface at the Site after it repaired the leak in April, 1976." It may be reasonable to argue that a liability policy issued by an insurer *after* an insured becomes aware of an occurrence should not provide coverage for losses arising from the occurrence. But the issue whether some hypothetical insurer *other* than Columbia could successfully assert a known-loss defense is not before us. Accordingly, this argument presents no basis for reversing the trial court's order granting Plantation's motion for summary judgment.

*Judgment affirmed. McFadden, J., concurs, and Dillard, J., concurs in judgment only.*

A16A0705.   COLUMBIA   CASUALTY   COMPANY   v.
PLANTATION PIPE LINE COMPANY.


DILLARD, Judge, concurring in judgment only.

I concur in judgment only because I do not agree with all that is said in the majority opinion. As a result, the majority's opinion decides only the issues presented in the case *sub judice* and may not be cited as binding precedent. See Court of Appeals Rule 33 (a).