**THIRD DIVISION**
**DOYLE, P. J.,**
**MARKLE and PADGETT, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**March 6, 2026**

# In the Court of Appeals of Georgia

A25A1664. PHILADELPHIA INDEMNITY INSURANCE COMPANY v. EUBANKS et al.

A25A1665. CONTINENTAL CASUALTY COMPANY v. EUBANKS et al.

A25A1666. THE NORTH RIVER INSURANCE COMPANY v. EUBANKS et al.

A25A1668. ZURICH AMERICAN INSURANCE COMPANY v. EUBANKS et al.

A25A1669. ZURICH AMERICAN INSURANCE COMPANY et al. v. EUBANKS et al.

MARKLE, Judge.

Between 1974 and 1994, at least 20 boys were sexually abused by teacher Roger Stifflemire while they were students at the Darlington School. Although several of the boys informed faculty and leadership at Darlington at the time of the abuse, the school took no action to investigate the allegations or terminate Stifflemire's employment. In May 2017, Darlington sent a letter to all alumni informing them that it had been

made aware of one instance of abuse. Thereafter, 20 students filed lawsuits against Darlington and Stifflemire, and both defendants ultimately settled the claims against them via consent judgments.[1] The plaintiffs then added Darlington's insurers to the suit, alleging breach of contract resulting from the various insurers' refusal to defend Darlington against the allegations. Based on the consent judgments, the trial court awarded judgment in the plaintiffs' favor amounting to $345 million against the insurers. The insurers now appeal both the damages award and the imposition of separate supersedeas bonds against each of them pending this appeal. For the reasons that follow, we reverse the damages award, and we dismiss as moot the appeal challenging the supersedeas bond.

1. *Procedural background*.[2]

---

[1] Under OCGA § 9-3-33.1(d)(1) (2015), alleged victims of past childhood sexual assault could file suit until July 1, 2017, regardless of whether the claims would have otherwise been time-barred.

[2] We thank the Complex Insurance Claims Litigation Association, the American Property Casualty Insurance Association, and the Federation of Defense and Corporate Counsel for their amici curiae briefs.

On June 30, 2017, ten former students filed suits against Stifflemire and Darlington,[3] alleging that they had been sexually abused by Stifflemire in the 1970s and 1980s, and that Darlington staff knew of the sexual abuse and failed to take any action to prevent it; Darlington held itself and its campus out to the public as a safe environment for children despite knowledge of Stifflemire's conduct; the defendants conspired to conceal the abuse; and Darlington falsely stated in a 2017 letter to alumni that it was aware of only one allegation of abuse.[4] Thus, they claimed that Darlington knowingly made false statements to families and students with the intent to deceive and to conceal the abuse.[5] The ten original plaintiffs voluntarily dismissed their complaints without prejudice in December 2017, and filed renewal actions on June 1, 2018. At the same time, seven additional former students filed suit, and three more

---

[3] The plaintiffs also named as defendants Frederick Marquette and David Ellis, alleging additional instances of abuse, assault, and battery. Those defendants were dismissed and are not parties to these appeals.

[4] There is evidence that multiple victims notified Darlington of the abuse in 1988 and 1999. And, as alleged in the complaint, several of the students notified faculty members and the school's headmaster of the abuse in the 1970s and 1980s.

[5] The original plaintiffs' complaints brought nearly identical claims, with two exceptions. First, some of the plaintiffs raised a claim for child sexual assault. Second, one of the suits included a wrongful death claim after the former student committed suicide in 2016 due to the abuse.

suits followed in 2019 and 2020. The suits were all transferred to the Superior Court of Floyd County and consolidated.

Ultimately, the plaintiffs settled their claims with Darlington for $351 million, of which Darlington was to contribute $6 million. In the settlement agreement, Darlington indicated that it had notified its insurers of the claims, but that each insurer had disclaimed coverage and refused to provide a defense.[6] Based on the settlements, the trial court entered consent judgments as to the claims against Darlington and Stifflemire, noting that these defendants acknowledged that the evidence supported a verdict for the plaintiffs, but that they denied the allegations and indicated that "having been placed in a position of continuing to defend itself on its own with no defense or indemnification provided by the insurer," they were choosing to settle the claims. The damage award against Darlington covered only the claims asserted against Darlington, and not those against Stifflemire.

---

[6] Lamorek Insurance Company and its affiliate, Commercial Union, had issued general liability and umbrella policies to Darlington from 1975 through 1992. Lamorek initially provided a defense to Darlington and Stifflemire under a reservation of rights, expressing its position that there was no coverage for sexual abuse because the intentional conduct was not an "occurrence" under the policy terms. Lamorek later became insolvent, and when Darlington notified the other insurers of the suits, they all declined to provide a defense.

Darlington also assigned its rights to the plaintiffs, allowing them to seek recovery directly from Darlington's insurers for any claims Darlington might have had under its policies. The assignment covered breach of contract and bad faith claims, and provided: "The amount of this assignment is a direct result of the insurers' failure to provide a defense and a failure to provide indemnification for the claims brought by the Plaintiffs."

The trial court then permitted the plaintiffs to add the insurance companies as defendants. All 20 plaintiffs filed a consolidated amended complaint, adding as defendants Philadelphia Indemnity Insurance Company ("PIIC"), Continental Casualty Company ("Continental"), The North River Insurance Company ("North River"), Great American Insurance Company ("Great American"), and Zurich American Insurance Company ("Zurich"). With regard to these defendants, the plaintiffs alleged breach of contract; sought direct recovery of insurance benefits; sought recovery as a judgment creditor; and requested attorney fees.[7] With the exception of Continental, all of the named insurers wrote commercial liability policies and excess and umbrella policies for Darlington that were in effect between 1996 and

---

[7] They initially included claims for bad faith and punitive damages, but later withdrew those claims.

2020, well beyond the time frame of Stifflemire's employment. Only Continental's policy was in effect during any part of the period in which the abuse and employment occurred — from 1975 to 1976.

All parties moved for summary judgment. As is relevant here, the insurers argued that the policies at issue did not cover the claims against Darlington. Following a hearing, the trial court granted summary judgment to the plaintiffs, finding that sexual abuse constituted a "bodily injury" under the various insurance policies, and the relevant time period for purposes of determining coverage was when the injury (i.e., the mental anguish) manifested itself rather than when the event that caused the injury (i.e., the abuse) occurred. The trial court then allocated damages against each of the insurers as follows: $232 million against PIIC; $1 million against Continental; $10 million against North River; $10 million against Great American; and $92 million against Zurich. The insurers now appeal.[8]

2. *The applicable law.*

Before we consider the coverage issues relevant to each insurer, we first set out the case law applicable to this dispute. And, under our standard of review, we consider

---

[8] Before this case was heard in oral argument, Great American withdrew its appeal.

6

these coverage issues de novo. *R&G Inv. & Holdings v. Am. Family Ins. Co.*, 337 Ga. App. 588, 592(2) (787 SE2d 765) (2016).

> Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. In reviewing the grant or denial of a motion for summary judgment, we apply a de novo standard of review, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.

*Progressive Mountain Ins. Co. v. Vining*, 373 Ga. App. 663, 663–64 (908 SE2d 350) (2024) (quotation marks omitted). See also OCGA § 9-11-56 (c).

"It is a cardinal rule of contract construction that a court should, if possible, construe a contract so as not to render any of its provisions meaningless and in a manner that gives effect to all of the contractual terms." *Milliken & Co. v. Ga. Power Co.*, 354 Ga. App. 98, 100 (839 SE2d 306) (2020) (citation modified); OCGA § 13-2-2. Thus, we construe contracts in a way that upholds the entire contract, and we consider the whole contract when we construe its individual parts. Id. "Courts should not render any language in a contract as superfluous, and any construction that

renders portions of the contract language meaningless should be avoided." Id. (citation omitted). And, it is well settled that,

> parties to an insurance policy are bound by its plain and unambiguous terms. ... [I]f the language is unambiguous and but one reasonable construction is possible, the court will enforce the contract as written. Interpretation of policy provisions which are plain and definite is a matter of law for the trial court, and a policy provision is not ambiguous even though presenting a question of construction, unless and until an application of the pertinent rules of construction leaves it uncertain as to which of two or more possible meanings represents the true intention of the parties.

*Rucker v. Columbia Nat'l Ins. Co.*, 307 Ga. App. 444, 447(1)(b) (705 SE2d 270) (2010) (quotation marks omitted). Nevertheless, we construe insurance policies liberally in favor of coverage and narrowly interpret any exclusion in favor of the insured. *Barrett v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 304 Ga. App. 314, 320-21(2) (696 SE2d 326) (2010). Yet, "[i]f the policy exclusions are unambiguous they must be given effect even if beneficial to the insurer and detrimental to the insured. We will not strain to extend coverage where none was contracted or intended." *First Specialty Ins. Corp. v. Flowers*, 284 Ga. App. 543, 545 (644 SE2d 453) (2007) (quotation marks omitted).

Insurance policies generally contain two duties relevant to the disputes here: A duty to defend and a duty to indemnify. These are separate and distinct obligations. *Fireman's Fund Ins. Co. v. Univ. of Ga. Athletic Assn.*, 288 Ga. App. 355, 364(3) (654 SE2d 207) (2007).

> [T]he duty to defend is determined by the contract; and since the contract obligates the insurer to defend claims asserting liability under the policy, even if groundless, the allegations of the complaint are looked to in order to determine whether a liability covered by the policy is asserted. Thus, an insurer's duty to defend is determined by comparing the allegations of the complaint with the provisions of the policy. … Indeed, in Georgia, insurance is a matter of contract, and the parties to an insurance policy are bound by its plain and unambiguous terms.

*Travelers Cas. Ins. Co. of Am. v. Bozovich*, 367 Ga. App. 868, 870-71(1) (888 SE2d 656) (2023) (citation modified); *Bruce v. Ga.-Pacific*, 326 Ga. App. 595, 601–02(3) (757 SE2d 192) (2014). As our Supreme Court has explained,

> [t]o excuse the duty to defend the petition must unambiguously exclude coverage under the policy, and thus, the duty to defend exists if the claim potentially comes within the policy. Where the claim is one of potential coverage, doubt as to liability and insurer's duty to defend should be resolved in favor of the insured.

*Penn–Am. Ins. Co. v. Disabled Am. Veterans*, 268 Ga. 564, 565–66 (490 SE2d 374) (1997) (citation modified). See also *Landmark Am. Ins. Co. v. Khan*, 307 Ga. App. 609, 612(1) (705 SE2d 707) (2011).

The duty to indemnify is based on the policy language as well. Obviously, if there is no coverage for the claims, there would be no duty to indemnify. See *Rucker*, 307 Ga. App. at 448(1)(b).

Importantly, an insurer's refusal to defend and indemnify its insured bars the insurer from contesting the insured's liability after a judgment, but it does not prevent the insurer from arguing that there was no coverage under the policy. *S. Guar. Ins. Co. v. Dowse*, 278 Ga. 674, 675-76(1), (2) (605 SE2d 27) (2004). See also *Morgan v. Guaranty Nat'l Co.*, 268 Ga. 343, 345 (489 SE2d 803) (1997) (insurer's decision not to defend suit waived all challenges to insured's liability, but did not waive challenges to coverage under the policy).

We look to the allegations in the complaint to determine if the policy would cover the claims. *Bozovich*, 367 Ga. App. at 870-71(1). Because the issues arise from Darlington's insurance coverage, we focus on the allegations pertaining to Darlington's conduct. As we have explained, "[t]o establish a prima facie case on a

claim under a policy of insurance the insured must show the occurrence was within the risk insured against." *Allstate Ins. Co. v. Grayes*, 216 Ga. App. 419, 420(1) (454 SE2d 616) (1995).

Here, the complaint alleges that Darlington did nothing to investigate the allegations of abuse, failed to terminate Stifflemire's employment, continued to allow Stifflemire to engage with students unsupervised, and concealed its knowledge of the allegations from current and prospective students. Focusing on these allegations, and with the above general legal principles in mind, we turn to the question of whether the claims are covered under the various policies, ultimately concluding that they are not.[9] See *Grayes*, 216 Ga. App. at 420(1).

*Case No. A25A1664.*

3. *Philadelphia Indemnity Insurance Company.*

---

[9] Nothing in this opinion should be read to minimize the abuse the victims suffered at the hands of Stifflemire, or Darlington's complete abdication of its responsibility to protect the students enrolled there. But we are constrained by the language in the various insurance policies and the well-settled principles of contract interpretation to reach the conclusion that there was no coverage under the defendants' policies.

11

In Case No. A25A1664, PIIC appeals from the $232 million damages award, arguing that there was no coverage under the terms of the policies. We agree that there was no coverage under the various policies, which were issued decades after the abuse occurred and Stifflemire's employment ended, and thus PIIC was not in breach of either the duty to defend or indemnify.

PIIC issued ten Commercial General Liability ("CGL") policies; four excess and six umbrella policies; and five FlexiPlus Five policies in effect from 2010 through 2020.[10] To determine whether PIIC was in breach of any of the policies, we consider each policy type in turn, noting that the relevant policy language is essentially the same in each renewal year. At issue is whether Darlington's conduct in failing to investigate allegations of abuse, supervise Stifflemire's contact with students, and terminate Stifflemire's employment due to the abuse — all of which occurred in the 1970s and 1980s — can be covered by insurance policies issued years after these

---

[10] Although the plaintiffs argue that PIIC abandoned any challenge to the award under the FlexiPlus Five policies by failing to make an argument supported by citations to authority, we disagree. PIIC's brief raises coverage challenges to all policies, and, consistent with the Appellate Practice Act, we will not consider such claims abandoned. OCGA §§ 5-6-30 ("the Act shall be liberally construed so as to bring about a decision on the merits of every case appealed and to avoid dismissal of any case or refusal to consider any points raised therein," absent certain exceptions); 5-6-48(b), (c) (listing exceptions).

events. The Plaintiffs acknowledge that all of their claims for negligence arise from "the same underlying sexual abuse by Stifflemire."

(a) *The CGL policies.*

PIIC argues that the trial court failed to take the language of the policies into consideration.

The CGL policies are occurrence based policies covering bodily injury, mental anguish, and personal and advertising injuries (which includes detention),[11] caused by an "occurrence" during the policy period — here 2010 through 2020.[12] However, the CGL policies include an "abuse or molestation exclusion" for injuries "arising out of" molestation, abuse, or the negligent hiring, retention, and supervision of a Darlington employee. This exclusion would bar recovery under the plain terms of the CGL policies. See *Allstate Ins. Co. v. Florio*, No. 1:19-CV-1179-TWT, slip op. at * 4-6(III)(B) (ND Ga. Jan. 23, 2020), 2020 WL 4529618 (unpublished). See also

---

[11] The trial court found that Stifflemire's conduct rose to the level of detention.

[12] "An occurrence policy is a policy in which the coverage is effective if the negligent act or omission occurs within the policy period, regardless of the date of discovery or the date the claim is made or asserted. A claims-made policy is a policy wherein the coverage is effective if the negligent or omitted act is discovered and brought to the attention of the insurer within the policy term." *Serrmi Prods. v. Ins. Co. of Pa.*, 201 Ga. App. 414 (411 SE2d 305) (1991) (citation modified).

*Continental Cas. Co. v. H. S. I. Fin. Servs.*, 266 Ga. 260, 262 (466 SE2d 4) (1996) (explaining that the claims of failure to supervise that arose from employee's criminal conduct were within the scope of the policy exclusion).[13]

Nevertheless, PIIC issued a specific endorsement for "sexual or physical abuse or molestation vicarious liability" ("SPAM").[14] This endorsement provides that PIIC will cover damages due to bodily injuries and mental anguish resulting from "abusive conduct," such as molestation, for which Darlington could be liable "by reason of"

---

[13] There is also an exclusion for conduct Darlington knew about prior to the policy period. Here, the plaintiffs alleged in their complaint that Darlington's headmaster knew of the abuse in the 1970s and 1980s. Under the terms of the policy, there would be no coverage for abuse of which Darlington had knowledge prior to the policy period. Notably, the trial court made a finding that Darlington was not aware of the abuse until 2016, when one of the victims informed the school. But this contradicts the allegations in the complaint, as admitted by Darlington as part of the consent judgment. *Brown & Williamson Tobacco Corp. v. Gault*, 280 Ga. 420, 424(3) (627 SE2d 549) (2006) ("Although a consent judgment is brought about by agreement of the parties, it is accorded the weight and finality of a judgment. Thus, a consent decree is an enforceable judgment and can be accorded preclusive effect."). Because we conclude there was no coverage under the applicable policies, we do not consider the prior knowledge exclusion.

[14] Where a general provision conflicts with a specific provision in the contract, the more specific provision controls. *Ga. Baptist Children's Homes & Family Ministries v. Essex Ins. Co.*, 207 Ga. App. 346, 348(1) (427 SE2d 798) (1993) (general exclusion for assault and battery did not control over specific exclusion for sexual abuse). Thus, the more specific SPAM endorsement coverage controls over the language and exclusions in the CGL policy.

negligent employment, selection, supervision, and retention.[15] The endorsement covers only those injuries that occur during the policy period. Thus, the question is whether the on-going mental anguish that resulted from Stifflemire's abusive conduct, which took place in the 1970s and 1980s, and for which Darlington could be liable under the theory of negligent supervision or retention, would be covered by policies not in effect until decades later. We conclude that it would not.

The plain and unambiguous language of the SPAM endorsement requires that the "bodily injury occur[] *during the policy period.*"[16] The policy does not define "occur," so we look to the ordinary definition. *Taylor Morrison Servs. v. HDI-Gerling Am. Ins. Co.*, 293 Ga. 456, 460(1) (746 SE2d 587) (2013) ("unless the policy itself indicates that a term is used in an unusual sense, we attribute to that term its usual and common meaning."); *Archer W. Contractors v. Estate of Pitts*, 292 Ga. 219, 224(2) (735 SE2d 772) (2012) ("[W]e generally accept that contractual terms carry their ordinary

---

[15] The policy also expressly excludes from the definition of "bodily injury" death resulting from mental anguish. Thus, the policy would not cover M. D.'s suicide.

[16] "The time when an insurance policy shall become effective is an essential element of the contract." *Pendley v. Union Bankers Ins. Co.*, 99 Ga. App. 189, 190(4) (107 SE2d 910) (1959) (quotation marks omitted).

meanings, OCGA § 13–2–2(2), and a dictionary is a useful tool for narrowing the range of meanings ordinarily attributed to a word.''). See also *Kelley v. Cincinnati Ins. Co.*, 364 Ga. App. 612, 617(1)(c)(i) (876 SE2d 51) (2022).

"Occur" generally means to "appear," "happen," or "to come into existence." Merriam-Webster Dictionary (last accessed 1/8/26). An injury could only appear, happen, or come into existence at a single point in time. Therefore, the fact that the mental anguish *continued* in subsequent years does not mean the injury "comes into existence" in each subsequent policy period. See, e. g., *Catholic Bishop of N. Alaska v. Cont'l Ins. Co.*, No. 4:08-CV-0038-RRB, slip op. at *12-13(II)(D.1) (D. Alaska July 30, 2010) (2010 WL 10095655) (under the policy language, mental injury recognized years after abuse would be covered by policy in place at time of abuse, but not subsequent policy); *State Farm Fire & Cas. Co. v. Estes*, 133 FSupp3d 893, 898(III)(A) (WD Ky. 2015) (considering terms of the policy and explaining "it seems that if the Policy does not cover the physical harm, then there is no bridge that would bring the later-suffered emotional harm under the Policy's umbrella."); *Asbury College v. Ohio Cas. Ins. Co.*, 2004-CA-001044-MC, slip op. at *2 (Kent. Ct. App. 2005) (2005 WL 1252331) (unpublished) (granting summary judgment to insurer in case

16

involving allegations of negligent hiring and sexual abuse at a school and a lawsuit brought more than 20 years later, explaining the insurance policy was not in effect at the time of the abuse).[17] Moreover, when we focus on *Darlington's* conduct, none of

---

[17] Where 'neither this Court nor the Supreme Court of Georgia has addressed the issue, we look to other jurisdictions for guidance." *Smith v. Smith*, 369 Ga. App. 213, 217(1) (892 SE2d 832) (2023) (quotation marks omitted). See also *Lee v. Smith*, 307 Ga. 815, 823(3) (838 SE2d 870) (2020). Other courts considering similar cases have found coverage only in those policy periods in which the abuse occurred, and we find those cases persuasive. *Estes*, 133 FSupp3d at 896-98(III)(A) (molestation, and the mental anguish that continued, both of which began years before policy period, were not covered even though mental anguish continued into policy period); *N. River Ins. Co. v. Broward County Sheriff's Off.*, 428 FSupp2d 1284, 1292(IV) (S D Fla. 2006) (false arrest that occurred years before policy was in effect was not covered by policy even if mental anguish continued into policy period); *Mann v. Tim Clark Constr.*, 273 So3d 397, 402-05 (La. Ct. App. 2019) (applying Louisiana law and holding that property damage and mental anguish that occurred prior to policy period, but which continued into policy period, was subject to pre-existing condition exclusion); *Philadelphia Indem. Ins. Co. v. The Chicago Trust Co.*, 930 F3d 910, 913-15 (7th Cir. 2019); *TIG Ins. Co. v. Smart School*, 401 FSupp2d 1334, 1343(IV)(A) (S. D. Fla. 2005) (considering similar policy language and concluding that multiple instances of abuse involving several victims was a single claim). Cf. *Roman Catholic Diocese of Springfield in Ill. v. Maryland Cas. Co.*, 139 F 3d 561, 567(III) (7th Cir. 1998) (involving allegations made in 1993 about abuse that occurred years earlier and finding that there was potential coverage for only those injuries that occurred during the policy period); *Servants of Paraclete v. Great Am. Ins. Co.*, 857 FSupp 822, 831-34 (DNM. 1994) (concluding that the alleged bodily injury did not occur during policy period and thus insurer had no duty to indemnify); *Preferred Risk Mut. Ins. Co. v. Watson*, 937 SW2d 148, 150 (Tex. Ct. App. 1997) (considering similar language that defined occurrence as "all acts" of molestation and concluding that abuse of two children constituted a single claim).

it "occurred" during the PIIC SPAM coverage periods. We thus conclude that, under the plain language of the SPAM endorsement, there would be no coverage under policies in effect between 2010 and 2020.

This conclusion is further supported by the other policy terms when we read the policy as a whole, giving meaning to all its provisions. *Milliken & Co.*, 354 Ga. App. at 100; *Archer Western Contractors*, 292 Ga. at 224(2); *Overlook Gardens Prop. v. Orix, USA*, 366 Ga. App. 820, 824(1)(a) (884 SE2d 433) (2023); OCGA § 13-2-2. We have "no more right by strained construction to make the policy more beneficial by extending the coverage contracted for than [we] would have had to increase the amount of the insurance." *Ga. Farm Bureau Mut. Ins. Co. v. Smith*, 298 Ga. 716, 721 (784 SE2d 422) (2016) (citation modified).

Under the policy, "abusive conduct" is defined as "each, every, and all actual, threatened, or alleged acts of physical abuse, sexual abuse, sexual molestation or sexual misconduct performed by one person or two or more people acting together." And, "each, every and all … abuse … shall be considered to be one 'abusive conduct' regardless of" the number of victims, acts, or period of time, and is "deemed to take place, for all purposes within the scope of this policy, at the time of the first such act

or encounter." Applying this policy language, the mental anguish stemming from the physical abuse and Darlington's failure to supervise is deemed to have occurred when the sexual abuse and molestation occurred in the 1970s and 1980s.[18] Although the mental anguish continued into the policy period, the negligent employment and supervision, which is the abusive conduct under the policy definitions, did not.[19]

Additionally, the SPAM coverage contains an exclusion for molestation "which predates the inception of this policy and continues into the policy period." In this case, all of the claims for molestation, abuse, and mental distress — which resulted from Darlington's negligence, fraud, and concealment — predate the coverage period and would be barred by the plain and unambiguous language of the exclusion. See, e.g., *Asbury College*, 2004-CA-001044-MC, slip op. at *2 (2005 WL 1252331). See also *Hanover Ins. Co. v. House Call Physicians of Ill.*, Case No. 15C3684, slip op. at *4-

---

[18] Other courts are split as to whether multiple instances of abuse involving multiple victims constitute a single occurrence. See Scott M. Seaman and Jason R. Schulze, "Allocation of Losses in Complex Insurance Coverage Claims" § 7:6 (2025) (collecting cases). But here, the policy expressly states that all instances of abuse would be considered as a single occurrence.

[19] Here, the trial court only determined that sexual abuse is a "bodily injury." But it did not consider that, for the period of coverage, there was no corresponding physical injury.

7(III)(A) (E D Ill. 2016) (2016 WL 1588507) (unpublished), (insurer had no duty to defend against abuse claims that predated policy period, noting "[o]ccurrence policies are designed to insure for incidents that occur during the policy period and not for incidents that already have happened"); *Bishop of Charleston v. Century Indemn. Co.,* 225 FSupp3d 554, 565-66 (III)(C)(1) (SD S.C. 2016) (rejecting claim that a policyholder was entitled to coverage for its own acts of negligence with regard to abuse by an employee "for periods beginning after the last act of abuse, even though sexual abuse undoubtedly causes lifelong harm. ... Were that the law, insurers would need to charge premiums for each period sufficient to cover decades of potential liability.").

In summary, based on the commonly understood definition of "occur" and the other express policy language, there is no coverage for bodily injury and mental anguish due to Darlington's conduct that pre-dated the policy period.[20] *Taylor*

---

[20] To the extent that the plaintiffs' argument could be interpreted to raise a "continuous trigger" theory, we have never applied it to sexual abuse and the resulting mental harm. See *Harvey v. Merchan*, 311 Ga. 811, 815-17(2)(a) (860 SE2d 561) (2021) (concluding that the theory does not apply where each injury is discrete and known to the victim at the time it occurs). See also *Bishop of Charleston*, 225 FSupp3d at 565-66(III)(C)(1) (declining to apply modified continuous trigger theory to sexual abuse claims that ended years before policy period). Regardless, the language of the policy controls, and, as detailed above, it confirms that coverage is not based on

*Morrison Servs.,* 293 Ga. at 462(1) ("The limits of coverage do not all have to be found in the word 'occurrence,' inasmuch as the other words of the insuring agreement—as well as the policy exclusions—have their own roles to play in marking the limits of coverage.").

The victims claim, however, that Darlington's 2017 letter to alumni alerting them of the allegations of abuse resulted in additional mental anguish and thus constituted a new claim of "bodily injury." See *Westport Ins. Corp. v. N. California Relief,* 76 FSupp3d 869, 881(III)(C) (N D Cal. 2014) (accepting plaintiffs' allegations of injury when the abuse happened and then finding there was a new injury years later when the plaintiffs learned the school had known about and concealed the abuse). We cannot agree that any mental anguish resulting from this letter would be covered because it does not arise from the negligent employment and supervision *during the policy period. Mann v. Tim Clark Constr.*, 273 So3d 397, 402-04 La. Ct. App. 2019); *Estes*, 133 FSupp3d at 896-98(III)(A); *Reed v. Netherlands Ins. Co.*, 860 FSupp2d 407, 413-15(IV)(E) (E D Mich. 2012) (where definition of bodily injury included mental

a continuous trigger theory.

anguish that results from physical injury, manifestation of symptoms of mental anguish outside policy period were not covered).

Plaintiffs further contend that we must look at when damage is sustained and not when the act which caused it took place to determine coverage since this is an occurrence based policy. They contend nothing in the policy expressly requires that the underlying physical harm occur within the policy period, and, to the extent the policy is ambiguous on this issue, it must be construed in their favor.

The plaintiffs' arguments are flawed, however, given the plain and unambiguous policy language that expressly defines multiple acts of abuse as a single incident that took place at the time of the first abusive act. See, e.g., *Asbury College*, slip op. at *2 (2005 WL 1252331). Moreover, we find the plaintiffs' interpretation of coverage to be overly broad. According to the plaintiffs, as long as the mental anguish was *present* in a policy period, it was covered. Under such an interpretation, once an insured suffered an injury, the insured would be able to claim coverage under any future insurance policies in perpetuity. We do not apply that logic to any other insurance claim, and we decline to do so here.

> [E]xamining the policy as a complete and harmonious instrument designed to accomplish a reasonable end, an insured cannot reasonably

22

expect a policy to cover injury originating years before the policy's inception. Insurance premiums undoubtedly do not reflect such risks and the Court can only speculate as to the enormous increase in premiums were such pre-policy injury causing events to be covered.

*Servants of Paraclete*, 857 FSupp at 834(B) (quotation marks omitted). We simply cannot conclude that the plaintiffs' claims of abuse and negligent conduct, and the resulting mental anguish, which began in the 1970s and 1980s and continues to this day "occurred" within the policy period of the SPAM coverage issued decades later. When we read all of the above cited provisions together, giving meaning to each one, we are left with the conclusion that the SPAM policies did not cover the abuse or Darlington's role in it. As a result, PIIC was not in breach of any duty to defend or indemnify under the SPAM policies, and it cannot be liable for damages.

(b) *Umbrella policies.*[21]

---

[21] Generally, an umbrella policy "has two functions: 1) to provide for a higher limit of liability for those losses typically covered by liability insurance ... ; 2) to provide for some coverage of those less common losses not typically covered by liability insurance[.]" *U. S. Fire Ins. Co. v. Cap. Ford Truck Sales*, 257 Ga. 77, 79(2) (355 SE2d 428) (1987) (citation modified). On the other hand, "[e]xcess or secondary coverage is coverage whereby, under the terms of the policy, liability attaches only after a predetermined amount of primary coverage has been exhausted. A second insurer thus greatly reduces [its] risk of loss. This reduced risk is reflected in the cost of the policy." Id. at 81(2)(e) (citation omitted).

The umbrella policies apply where the underlying insurance does not cover the claims. It covers bodily injury that occurs during the policy period and that arises from an "occurrence" during the policy period, and contains an endorsement covering molestation. "Bodily injury" is defined as "bodily injury, sickness, or disease sustained by a person, including death resulting from any of these at any time." The policy also covers personal and advertising injury, which includes detention, "caused by an offense arising out of your business but only if the offense was committed ... during the policy period." As noted earlier, the trial court found Stifflemire's detention of the victims qualified as a personal injury. It is undisputed, however, that no instances of detention occurred during the umbrella coverage periods.

Plaintiffs' claims for coverage under the umbrella policies fails for the same reason discussed with respect to the SPAM coverage: None of the injuries occurred, as that word is generally defined, during the policy periods.

Additionally, the umbrella policy requires that the bodily injury result from an "occurrence,"[22] which is defined as "an *accident*, including continuous or repeated

---

[22] This same language appears in the CGL and the SPAM endorsement and would likewise bar coverage under those policies.

24

exposure to substantially the same general harmful conditions."[23] (emphasis added).

As we have explained,

> [w]hile [the policy] did not define accident, in Georgia "accident" is defined as an event which takes place without one's foresight, expectation or design. In an insurance policy, an accident is an unexpected happening rather than one occurring through intention or design. The question of whether an event took place without one's foresight, expectation or design must be asked from the viewpoint of the insured.

*Rucker*, 307 Ga. App. at 447(1)(b). See also *Provident Life and Accident Ins. Co. v. Hallum*, 276 Ga. 147, 148 (576 SE2d 849) (2003) ("An accidental injury is an injury that is unexpected but may arise from a conscious voluntary act. In contrast, an injury from accidental means is one that is the unexpected result of an unforeseen or unexpected act that was involuntarily or unintentionally done."). Compare *Cincinnati*

---

[23] We have never addressed what constitutes "continuous and repeated exposure" in the context of sexual abuse. Compare *Worcester Ins. Co. v. Fells Acre Day School*, 558 NE2d 958, 973(7) (Mass. 1990) (considering same definition of occurrence and finding that allegations of "numerous discrete acts of abuse, negligence, and breach of duty by several different defendants, some individual and one corporate, at different locations ... preclude the possibility that there was but a "single, ongoing cause of the injuries alleged. Further, we have rejected attempts by insurers to characterize seemingly discrete events as emanating from a single, ongoing cause.").

*Ins. Co. v. Magnolia Estates*, 286 Ga. App. 183, 185 (648 SE2d 498) (2007) (attack on nursing home resident was not foreseeable to insured nursing home and was "properly characterized as accidental for purposes of coverage").

We have held that intentional conduct does not qualify as an "accident."[24] See *Ga. Farm Bureau Mut. Ins. Co. v. Hall County*, 262 Ga. App. 810, 813(1) (586 SE2d 715) (2003). See also *Maryland Cas. Co. v. Jacob Ward, M.D.*, No. 1:14-CV-160-MHC, slip op. at *5(III)(A) (2015 WL 11237022) (N. D. Ga. 2015) ("occurrence" in policy did not include intentional conduct such as sexual battery); *State Farm Fire & Cas. Co. v. Brewer*, No. 1:06-CV-2296-RWS, slip op. at *3-4(II) (2008 WL 450817) (N D Ga. 2008) (sexual abuse was not "occurrence" under policy because it was intentional conduct).

---

[24] Notably, there is a line of Georgia cases holding that there can be no coverage for sexual abuse because such acts are intentional rather than "accidents." See *Roe v. State Farm Fire & Cas. Co.*, 259 Ga. 42 (376 SE2d 876) (1989); *Perry v. State Farm Fire & Cas. Co.*, 297 Ga. App. 9, 11(1) (676 SE2d 376) (2008); *O'Dell v. St. Paul Fire & Marine Ins. Co.*, 223 Ga. App. 578, 580(1) (478 SE2d 418) (1996); *Presidential Hotel v. Canal Ins. Co.*, 188 Ga. App. 609, 611 (373 SE2d 671) (1988). Other jurisdictions have taken a less stringent approach. See, e.g., *Fells Acres Day School*, 558 NE2d at 970-71(5)(a) (defendant's conduct was reckless where it knew of abuse and failed to protect students, but reckless conduct is not an "expected or intended" injury to be excluded from insurance coverage). But we are concerned here with *Darlington's* conduct, not Stifflemire's. Thus, we consider whether the allegations against Darlington constitute accidents.

Here, the Plaintiffs premised their allegations against Darlington on the fact that Darlington knew of the abuse; failed to stop it or warn other students; and concealed the conduct. Under these facts, and given the policy language and our case law addressing the definition of "accident" as applied to insurance policies, we cannot say that the umbrella policies cover Darlington's conduct. See, e.g., *Taylor Morrison Servs. v. HDI-Gerling Am. Ins. Co.*, 293 Ga. 456, 465-66(2) (746 SE2d 587) (2013) (fraud, which requires elements of intentional conduct and knowledge, would generally not qualify as an accident); *Pilz v. Monticello Ins. Co.*, 267 Ga. App. 370, 373 (599 SE2d 220) (2004); *SCI Liquidating Corp. v. Hartford Fire Ins. Co.*, 181 F3d 1210, 1216(III)(D) (11th Cir. 1999) (applying Georgia law and holding "allegations of intentional sexual harassment, assault, battery, and negligent retention do not constitute an 'occurrence,' as defined by [the insurance policies, which] define occurrence as an accident, and do not cover the intentional conduct[.]") (punctuation omitted)). See also *Serrmi Products v. Ins. Co. of Pa.*, 201 Ga. App. 414, 415 (411 SE2d 305) (1991) ("an unambiguous policy requires no construction, and its plain terms must be given full effect even though they are beneficial to the insurer and detrimental to the insured." (citation modified)). As such, PIIC was not obligated to provide a

27

defense or indemnification under the umbrella policies, and it would not be liable for the damages imposed.

(c) *Excess policies.*

The excess policies include SPAM coverage "but only to the extent that coverage is provided for by the" underlying insurance. These policies cover damages that are not payable by the underlying insurance because of non-coverage or exhaustion of the underlying insurance. This policy follows form to the SPAM coverage and is subject to the same definitions and exclusions.[25] Thus, by its express terms, and for the reasons discussed above, the excess policy does not cover the Plaintiffs' claims, and PIIC was not liable for any damages under these policies.

(d) *FlexiFive Plus policies.*

Finally, PIIC issued a series of claims-based policies, which cover claims made during the policy period for (i) Director and Officer (D&O) wrongful acts such as misleading statements, neglect, breach of duty, and personal and advertising injury (detention); and (ii) employment practices, such as sexual harassment of any kind.

---

[25] "'Follow-form' excess policies generally provide a scope of coverage subject to the same conditions and limitations (with the exception of policy limits) of the underlying primary insurance." Bruner & O'Connor Construction Law § 11:635.

Because they are claims-made policies, the relevant period is when the Plaintiffs first asserted the claims, not when the wrongful acts occurred.[26] Thus, these policies *could* provide coverage for suits filed during the policy years even though the conduct occurred decades earlier.

But, we must conclude that there is no coverage here because the policies contain exclusions that foreclose coverage for the Plaintiffs' allegations. Under the unambiguous terms of the policies, there is an exclusion for claims "arising out of, based upon or attributable to any dishonest or fraudulent act or omission or any criminal act or omission" if there has been a final judgment establishing Darlington's liability. Here, as set out in the consent judgment, all of the Plaintiffs' claims against Darlington for fraud, negligent infliction of emotional distress, intentional infliction of emotional distress, and negligent hiring and supervision, arise from Darlington's alleged dishonest and criminal actions and omissions. As a result, regardless of how the claim is pled, the conduct falls within a coverage exclusion. See *Jefferson Ins. Co. of New York v. Dunn*, 269 Ga. 213, 215 (496 SE2d 696) (1998) ("by its express terms,

---

[26] These policies were in effect from June 10, 2016 through June 10, 2021. The 2017 policy expired in early June 2017, so the complaint that was filed at the end of June 2017 would not be a "claim" under the 2017 policy. The parties conceded as much before the trial court.

the exclusionary clause is focused solely upon the genesis of plaintiff's claims—if those claims arose out of the employee's culpable conduct, as they did, then coverage need not be provided") (citation modified). See also *Video Warehouse v. S. Trust Ins. Co.*, 297 Ga. App. 788, 791(1) (678 SE2d 484) (2009) (explaining "arising out of" language excludes all claims regardless of the theory of tort liability). Any other conclusion would alter the plain meaning of the exclusion and ignore the "arising out of, based upon, or attributable to" language in the policy. *Dunn*, 269 Ga. at 215

As a result, the trial court erred by finding that there was coverage under any of the PIIC policies, and we must reverse that damages award. Having concluded that the PIIC policies do not cover the claims at issue, we need not address PIIC's remaining enumerations of error.

*Case No. A25A1665.*

4. *Continental Casualty Company*.

In Case No. A25A1665, Continental argues that there is no umbrella coverage under the policy. Plaintiffs concede, and the trial court recognized, that only one victim would potentially fall within the coverage period, September 1975 through

September 1976. Continental declined to defend on the ground that the limits of the primary policy had not been exhausted.[27]

The Continental policy is divided into two provisions: Coverage A and Coverage B.[28]

(a) Pursuant to the terms of Coverage A, Continental agreed to indemnify for loss in excess of the underlying policy with Commercial Union. The umbrella policy incorporated the terms of the underlying policy, which covered any "bodily injury" caused by an "occurrence" during the policy period.

Although the abuse suffered by this victim and Darlington's alleged role in it, as set forth in the complaint, could satisfy Coverage A's requirements, there is no

---

[27] In at least one letter, Continental stated it was reserving its rights, but also denying a defense. *Hernandez v. Great Am. Alliance Ins. Co.*, 365 Ga. App. 511, 514-15(1) (879 SE2d 522) (2022). Contrary to Continental's argument, it cannot refuse to defend *and* reserve its rights. *Am. Safety Indemnity Co. v. Sto Corp.*, 342 Ga. App. 263, 268(2) (802 SE2d 448) (2017) ("a reservation of rights is only available to an insurer who undertakes a defense while questions remain about the validity of the coverage. For this reason, an insurer cannot both deny a claim and reserve its right to assert other defenses later." (citation modified)).

[28] Per the express terms of the policy, there was no duty to defend under Coverage A. Thus, Continental cannot be in breach on any such duty, and its obligations under Coverage A, if any, would be limited to a duty to indemnify. In contrast, Coverage B contains both a duty to defend and a duty to indemnify.

evidence the abuse occurred during the policy period.[29] In his deposition, the victim stated that the sexual contact began in his 8th grade year, which would have been in the 1980s. Because the bodily injury did not occur during the policy period, there is no coverage under Coverage A, and Continental was not obligated to indemnify Darlington. *Travelers Ins. Co. of Am.*, 367 Ga. App. at 870-871(1); see also *Rucker*, 307 Ga. App. at 448(1)(b).

(b) Coverage B provides umbrella coverage applicable to personal injuries not covered by the primary insurance or "damages not covered by underlying insurance but which results from an occurrence covered by underlying insurance." Under Coverage B, personal injury is defined to include mental anguish, which the underlying policy did not include in its definition. Coverage B also provides coverage for personal injury due to detention.

But, as with Coverage A, there is no evidence that the injuries occurred during the policy period. Thus, the alleged abuse was not covered by the policy. *Travelers Ins.*

---

[29] Continental contends that any testimony to the contrary should be rejected under *Prophecy Corp. v. Charles Rossignol, Inc.*, 256 Ga. 27, 30(2)-(3) (343 SE2d 680) (1986) (barring a party's self-contradictory testimony from consideration on motion for summary judgment absent any explanation for the contradiction). Our review of the record shows no such inconsistencies under *Prophecy*.

*Co. of Am.*, 367 Ga. App. at 870-871(1). As such, Continental was not in breach of either a duty to defend or a duty to indemnify, and the trial court erred in finding Continental liable for the damages. *Penn–Am. Ins. Co.*, 268 Ga. at 565–66; *Landmark Am. Ins. Co.*, 307 Ga. App. at 612(1). In light of our conclusions here, we do not address Continental's other claims of error.

*Case No. A25A1668.*

5. *Zurich American Insurance Company*

In Case No. A25A1668, Zurich argues that there was no coverage under the policies because no "bodily injury" occurred during the policy periods, and there were no "occurrences" triggering coverage.

Zurich issued the following policies between 1996 and March 2010: CGL, March 1996 through March 2000; CGL and umbrella, 2001 through 2010; and excess, 2006 through 2010. We consider each in turn.

(a) *CGL policies*.

The policies cover "bodily injury" caused by an "occurrence" during the policy period. The definition of "bodily injury" includes mental anguish "resulting from bodily injury." Occurrence is defined as "an accident, including continuous or

33

repeated exposure to substantially the same general harmful conditions." Generally, an expected or intended consequence is not an "accident." See *Rucker*, 307 Ga. App. at 447(1)(b).

Here, there was no "bodily injury" caused by an "occurrence" during the policy periods of 1996 through 2010. None of the alleged abuse, Darlington's false statements, Stifflemire's employment, the former student's suicide, or the 2017 letter occurred during the policy periods. As discussed, the fact that the mental anguish from the abuse continued into those years does not result in bodily injury occurring during the policy period. *Hanover Ins. Co.*, No. 15C3684, slip op at *4(III)(A) ( 2016 WL 1588507) ("[o]ccurrence policies are designed to insure for incidents that occur during the policy period and not for incidents that already have happened").

Moreover, the allegations of intentional misconduct do not qualify as "occurrences" as that term is defined in the policy. See *O'Dell v. St. Paul Fire & Marine Ins. Co.*, 223 Ga. App. 578, 580(1) (478 SE2d 418) (1996) (allegations of sexual harassment, assault, and battery are intentional and do not fall within the definition of occurrence); *Presidential Hotel v. Canal Ins. Co.*, 188 Ga. App. 609, 611 (373 SE2d 671) (1988) (where plaintiffs alleged sexual harassment and fraud, any bodily injury

was the result of intentional conduct, which did not meet the definition of "occurrence" under the policy); *SCI Liquidating Corp. v. Hartford Fire Ins. Co.*, 181 F3d 1210, 1216(III)(D) (11th Cir. 1999) (under Georgia law, "allegations of intentional sexual harassment, assault, battery, and negligent retention do not constitute an 'occurrence,' as defined by [the insurance policies, which] define occurrence as an accident, and do not cover the intentional conduct." (punctuation omitted)).

(b) *Umbrella and excess policies*.

Zurich issued policies for umbrella and excess coverage.[30] Coverage A provides excess coverage that is to follow form to the CGL and applies where the underlying insurance applies. Having concluded that the underlying insurance did not provide coverage, there is no coverage under A.

Coverage B provides umbrella coverage for bodily injuries and personal injuries that occur during the policy period and are caused by an occurrence. For Coverage B, bodily injury is defined as physical injury, including mental anguish "if directly resulting from" the physical injury. Personal injury is defined as bodily injury arising out of detention, including mental anguish "if directly resulting from" the detention.

---

[30] These policies expressly provided for a duty to defend as well as to indemnify.

As discussed above, none of the physical injuries occurred *during* the policy period, and the conduct did not qualify as an "occurrence" as required under the policies. Furthermore, because the Plaintiffs' claims arise from intentional conduct, the exclusion for intentional injuries applies. *SCI Liquidating Corp.*, 181 F3d at 1216(III)(D). As a result, Zurich was not in breach of any duty to defend or indemnify. *Penn–Am. Ins. Co.*, 268 Ga. at 565–66; *Landmark Am. Ins. Co.*, 307 Ga. App. at 612(1); *First Speciality Ins. Co.*, 284 Ga. App. at 545 (giving effect to unambiguous policy exclusions). And, given our resolution of the coverage issues, we do not address Zurich's other enumerations of error.

*Case No. A25A1666.*

6. *The North River Insurance Company*.

In Case No. A25A1666, North River argues that there was no coverage because the claims fell outside the coverage period, and the plaintiffs' claims fail due to the applicable policy conditions.

North River issued five policies in effect from 2006-2010 as excess and umbrella policies that follow form to the Zurich policies.[31] Those policies incorporate the

---

[31] In addition, there is a "claims-made" policy issued in 2019, but plaintiffs concede they did not make a claim under that policy; only the policies from 2006

36

definitions and exclusions in the underlying Zurich policies. Because we concluded in Division 5 that there was no coverage under the Zurich policies, there is also no coverage under the North River policies. In light of this conclusion, we need not address North River's other arguments on appeal.

*Case No. A25A1669.*

7. In Case No. A25A1669, the insurance companies appeal from the trial court's order requiring each of them to post a supersedeas bond equal to the company's amount of damages or the statutory maximum.[32] See OCGA § 5-6-46(b). Having concluded that none of the policies covered the plaintiffs' injuries, and therefore the trial court's order awarding damages must be reversed, the supersedeas bond is moot. *Executive Cars v. Western Funding*, 349 Ga. App. 517, 528(3) (826 SE2d 370) (2019) (physical precedent only). Cf. *Smith v. Blackhall Real Estate*, 373 Ga. App. 177,

---

through 2010 are at issue. We further note that the excess policy did not include an obligation to defend under the policy's terms. As such, North River cannot be in breach on any such duty, and its obligations, if any under this policy, would be limited to a duty to indemnify.

[32] Specifically, PIIC was ordered to post a bond in the amount of $25 million; Zurich in the amount of $25 million; North River in the amount of $10 million plus interest; and Continental in the amount of $1 million plus interest.

191(3)(a) (908 SE2d 1) (2024) (supersedeas bond appeal moot once trial court's judgment affirmed). We therefore dismiss this appeal.

*Judgments reversed in Case Nos. A25A1664; A25A1665; A25A1666; A25A1668; appeal dismissed as moot in Case No. A25A1669. Padgett, J., concurs. Doyle, P. J., concurs fully in Divisions 1, 2, 3, 5, 6, and 7, and in judgment only in Division 4.*